Timothy West McCORQUODALE

v.

Charles BALKCOM, Warden, Georgia State Prison.

Civ. A. No. C79–95.

United States District Court, N. D. Georgia, Atlanta Division.

Oct. 21, 1981.

John R. Myer, Atlanta, Ga., Jack Greenberg, James M. Nabrit, III, Joel Berger, John Charles Boger, New York City, Anthony G. Amsterdam, Stanford, Cal., for plaintiff.

Lewis R. Slaton, Fulton County Dist. Atty., H. Allen Moye, Asst. Fulton County Dist. Atty., John W. Dunsmore, Jr., Asst. Atty. Gen., State of Ga., Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 *et seq.*, in which Petitioner seeks release from state custody, is now before the Court on the Magistrate's Report and Recommendation.

Timothy West McCorquodale was convicted of murder and sentenced to death in the electric chair in the Superior Court of Fulton County, Georgia, on April 12, 1974. On December 3, 1974, the Georgia Supreme Court affirmed his conviction and sentence. *See McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974), *cert. denied sub nom. McCorquodale v. Georgia,* 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218, *rehearing denied,* 429 U.S. 873, 97 S.Ct. 190, 50 L.Ed.2d 154 (1976). He tried unsuccessfully to obtain habeas corpus relief in state court, *McCorquodale v. Stynchcombe,* 239 Ga. 138, 236 S.E.2d 486 (1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 534, 54 L.Ed.2d 467, *rehearing denied,* 434 U.S. 1041, 98 S.Ct. 784, 54 L.Ed.2d 792 (1978), and to obtain a new trial by extraordinary motion, 242 Ga. 507, 249 S.E.2d 211 (1978). McCorquodale then filed the present petition for writ of habeas corpus attacking both his conviction and his death sentence.

## FACTS

The trial transcript reflects the following chronology: immediately prior to the beginning of the trial, Petitioner tried unsuccessfully to tender a guilty plea. (Tr. 32, 40, 96). The plea was opposed by the State,

there being some question as to whether the death penalty could be imposed on a guilty plea.[1] Although the judge ultimately decided the Georgia statute would permit him to impose the death penalty (Tr. 69–70), he rejected the plea because of his own stated conscientious objection to the death penalty. (Tr. 72–73).

There then ensued a debate between counsel as to how to handle appropriately the plea which was to be inscribed on the indictment and thus revealed to the jury.[2] Counsel for Petitioner refused to sign a "not guilty" plea. (Tr. 73–74). Therefore, counsel for Petitioner was directed to enter the plea as "guilty" on the indictment. (Tr. 74–75). This was done. (Tr. 75). Having done this, however, the court again indicated it was not accepting the guilty plea. (Tr. 96). The court then decided that the legal posture of the case was then such that the Petitioner was deemed to "stand mute" (Tr. 97–98) and that that was equivalent to a plea of not guilty.

Following a hearing on the Petitioner's motion to suppress his confession and the jury selection, Petitioner's counsel stated the following in his opening statement:

Ladies and gentlemen, we have been here trying to plead guilty for two days.

. . . .

Ladies and Gentlemen, we're guilty. We know it. It's that simple. And I think when you go throughout this trial and throughout this whole hearing you'll never hear any statement from us other than that. So that's the posture we are in today. We don't deny what the witnesses are going to say. I ask you to please even though here before you we say we're guilty, I ask you to please be attentive … I couldn't go into [the evidence] in detail [during voir dire], neither could Mr. England, but I tried to show you Ladies and Gentlemen, we are guilty. (Tr. 468–69).

Briefly stated, the facts as revealed by the State's witnesses were the following: One evening, Petitioner and a friend of his known only as Leroy were having drinks in a bar in Atlanta's "strip" area with Petitioner's girlfriend Bonnie and an acquaintance of hers, Donna Dixon, who was at that point passing through Atlanta on her way to Florida. Apparently, at some point prior to that meeting, Leroy had given Donna $50.00. While they were having drinks, Leroy told Petitioner he was upset, having learned that Donna had given the $50.00 to a Negro pimp.[3] An argument ensued wherein Donna either took the position that Leroy had not given her any money or that she did not have the money.

The Petitioner, Leroy, Donna and Bonnie got in a cab and went to an apartment belonging to Bonnie and a female roommate, and where the Petitioner and Bonnie's three-year old daughter also lived. When they arrived, the group, including the roommate Linda, sat down in the living room. According to Bonnie, ". . . all of a sudden he [the Petitioner] said to Leroy, I think we ought to teach this girl not to be 'a nigger lover.'" (Tr. 499). Thereafter, Petitioner removed Donna's clothing and over a period of approximately two and one-half hours, performed various types of sexual torture and mutilation on her.[4] Both Petitioner and Leroy had intercourse and oral sex with her. During most of the time Donna was gagged, bound and lying on the floor. Bonnie and the roommate Linda sat and watched[5], with Bonnie occa-

---

1. The Georgia statute providing for jury determination of the sentence in capital cases appears to cover only the situation where the issue of guilt has been determined by a jury. See Ga.Code Ann. § 26–3102 (1977 rev.).

2. The customary procedure in this court is to send the indictment and plea out with the jury.

3. All of the indicated persons were white.

4. For a very detailed and graphic statement of these facts, see McCorquodale v. State, supra.

5. Bonnie and Linda testified at the trial. The two eyewitnesses' accounts of the foregoing were basically consistent with each other, although Linda indicated she had been absent from the room at various points during the torture sequence. Also, she did not witness the strangulation.

sionally responding to commands from the Petitioner to fetch various items.

Following the foregoing sequence of events, Petitioner granted Donna's request to go to the bathroom. At this time she was not tied or gagged and was unaccompanied.

While Donna was out of the room, Petitioner said he was "going to have to kill her." (Tr. 509). At his request, Bonnie furnished some rope. When Donna reappeared, the Petitioner strangled her, initially with the rope and then with his hands. After she was apparently dead, he broke her arms and legs in order to fit her body into a cardboard trunk. After an unsuccessful foray to locate a van to move the trunk, the Petitioner, Leroy, Bonnie and the roommate returned to the apartment. According to Bonnie, Petitioner and Leroy passed out on the couch and the two girls went to a nearby beauty parlor for Bonnie to get her hair done. (Tr. 517).

The strangulation and physical indicia of most [6] of the various torture techniques were confirmed by a physician who had examined the victim's body.

The next evening the victim's nude body was found on the side of a highway. The Petitioner was arrested later that night on an informant's tip. At 5:00 a. m. the Petitioner signed a detailed confession which corroborated the racial motive for the killing, the fact of the strangulation, and that the Petitioner had had to break the victim's arms and legs to get her into the trunk. This confession was introduced into evidence at the trial [7] over Petitioner's objections.

Petitioner called no witnesses and chose not to cross-examine many of the State's witnesses. However, through cross-examination of the physician called by the State, Petitioner elicited testimony that the victim's bones were not actually broken, but that there was only cartilage and tendon breakage (Tr. 618); further, the physician stated on cross that there does exist a medical phenomenon known as masochism (Tr. 621).

Defense counsel's closing argument indirectly suggested to the jury that the victim had willingly engaged in sadomasochistic activities with Petitioner [8] and that Bonnie's testimony, to the extent it suggested otherwise, was not credible. He then went on to say:

Yes, he killed her. The evidence points to that and the State says that. We're going to get into some of this later on.... Come right to the gut of it, he's guilty of the crime of murder. Maybe he's guilty and the Judge is going to charge you [sic] murder. Maybe he's guilty of manslaughter.[9] The Judge is going to charge you that it has to be done with malice aforethought. You'll decide if it's malice or not. That's an issue I can't decide for you.... Try in your mind to ascertain what you believe happened out there and I think you'll find him guilty. Thank you. (Tr. 700–02).

The court charged the jury on the definition of murder as set forth in Ga.Code Ann. § 26–1101(a) (1977 rev.). It also charged that

[t]he law presumes that a person intends to accomplish the natural and probable consequences of his acts and if a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death and thereby causes the

---

**6.** Among the more inflammatory parts of Bonnie's testimony was her statement that Petitioner had cut the victim's clitoris with a pair of scissors. This was not mentioned or confirmed by the physician.

**7.** The circumstances surrounding the confession are described in more detail in the section of this Order which deals with Petitioner's challenge to its admissibility.

**8.** Though Petitioner's counsel did not explicitly make this argument to the jury, the Court believes it is implied by his statements and also implied in his questions asked of the witnesses.

**9.** Petitioner's theory, advanced to the judge out of the jury's presence, was that the killing was a crime of passion (i. e., voluntary manslaughter) which resulted from a sadomasochistic orgy which got out of control. (Tr. 61–68).

death of a human being, the law presumes the intent to kill. This presumption may be rebutted. (Tr. 709).

Petitioner excepted to the charge on the ground that it failed to include a charge on voluntary manslaughter. Also, Petitioner excepted to the court's failure to instruct the jury that the Petitioner had a right to "stand silent." The court called the jurors back and gave a charge on Petitioner's right to stand silent, but no charge on voluntary manslaughter was given.

Pursuant to Georgia statute, the same jury which found Petitioner guilty also determined the sentence. In that hearing, the Petitioner introduced evidence which showed that the victim was a transient who, although a teenager, was masquerading under a false adult identity; that the Petitioner had been very drunk during the torture-murder sequence and that the victim did not appear to resist the acts of sex and torture, up to the point when the Petitioner began choking her. Petitioner also called a detective who testified that the day after the confession, Petitioner had been remorseful and had cried. On cross, the detective further stated this had occurred at the point when he had told Petitioner they had learned the victim in fact had not given the $50.00 to a black pimp.

In the closing arguments during that phase of the trial, counsel for the prosecution stated his view that both counsel and the trial court had performed their respective functions in a commendable way. He went on to say that the jury also had a vital contribution to make, "And after your decision, the Appellate Court will have a very important responsibility." (Tr. 766). The defense vigorously objected. The judge, after hearing the matter out of the presence of the jury, called the jury back and after characterizing the remark as "highly improper," instructed the jury to eliminate it from their minds "as though it was never made." (Tr. 770–71).

The closing arguments were concluded and Petitioner's motion for mistrial denied. The jury was charged relative to determination of the appropriate sentence. It re-

turned a verdict fixing the penalty at death.

## ISSUES

Petitioner raises the following ten contentions in support of his Petition: (1) the charge of the state trial court improperly shifted the burden of proof; (2) Petitioner's confession was not voluntary and therefore was wrongfully admitted into evidence; (3) "death scrupled" jurors were wrongfully excused for cause; (4) the Georgia death statute is being applied in a racially discriminatory manner; (5) regional variation in jury sentencing within Georgia indicates that the death penalty is being arbitrarily imposed; (6) the prosecutor's closing argument denied the Petitioner a fair trial; (7) the Georgia system of appellate review denied Petitioner effective assistance of counsel, a fundamentally fair sentence review, and his right not to suffer unusual punishment; (8) appellate review was inadequate because the Chief Justice of the Georgia Supreme Court was biased; (9) Petitioner is incompetent and should not, therefore, be executed; and (10) electrocution is a cruel means of punishment.

The Magistrate analyzed each of these contentions at length and found them lacking. He recommends that the Petition be denied. Petitioner has objected to virtually all of the Magistrate's findings and recommendations; therefore, a re-examination of each is required. In the discussion which follows, the Court will examine first Petitioner's contentions which relate to his conviction and then those attacking his sentence.

## DISCUSSION

I.  Petitioner's Conviction

A.  Effect of Jury Charge

Petitioner contends that the trial court's instruction to the jury that they could presume Petitioner intended the natural consequences of his acts impermissibly lifted from the prosecution the burden of proving an essential element of the crime beyond a

reasonable doubt. Petitioner also argues that unconstitutional jury instructions affecting the burden of proof can never constitute "harmless error." The relevant portions of the charge are as follows:

Now ladies and gentlemen, the defendant enters upon the trial of this case with the presumption of innocence in his favor and that presumption remains with him throughout the trial of the case until and unless the State produces evidence in your presence and hearing sufficient to satisfy your minds beyond a reasonable doubt of the defendant's guilt of the offense as charged in the bill of indictment. It is necessary for the State to prove every material allegation of the bill of indictment to your satisfaction and beyond a reasonable doubt by the production of evidence before you would be authorized to find the defendant guilty.

   *    *    *    *    *    *

Now, the State contends that the defendant is guilty of the offense of murder as charged in Indictment No. A–20205. A person commits murder when he unlawfully and with malice aforethought, either expressed [sic] or implied, causes the death of another human being. Express malice is that deliberate intention, unlawfully, to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.

Malice in its legal sense, is not necessarily ill will or hatred. It is the unlawful, deliberate intention to kill a human being without justification or mitigation or excuse, which intention must exist at the time of the killing. I instruct you however, it is not necessary that this unlawful deliberate intention should exist for any particular length of time before the killing. *The law presumes that a person intends to accomplish the natural and probable consequences of his acts and if a person uses a deadly weapon or instrumentality in the manner in which*

*such weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill. This presumption may be rebutted.*

I further instruct you, a person will not be presumed to act with criminal intention, but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

Now ladies and gentlemen, I charge you that if you believe beyond a reasonable doubt that the defendant in this County at any time prior to the return of this indictment, with the weapon and instrumentality named in the indictment, and with malice aforethought, either expressed [sic] or implied, did unlawfully and intentionally kill the deceased as charged in the indictment, and you believe the weapon or instrumentality used in the manner used, if one was used, was one likely to produce death, then you would be authorized to convict the defendant of the offense of murder.

After considering all the facts and circumstances, and after applying the principles of law given you in charge, in the event you should find the defendant guilty of the offense of murder, the form of your verdict would be, "We, the jury, find the defendant, Timothy W. McCorquodale, guilty of murder."

Now ladies and gentlemen, applying the principles of law heretofore given you in charge by the Court, I instruct you, if from a consideration of the evidence or from a lack of evidence, you believe the defendant not guilty, or if there rests upon your minds a reasonable doubt as to the defendant's guilt, it would be your duty to acquit him and the form of your verdict would be, "We, the jury, find the defendant, Timothy W. McCorquodale, not guilty."

(Tr. 704, 708–11) (emphasis added).

Petitioner challenges the underlined portion of the foregoing excerpt from the charge. In *Sandstrom v. Montana,* 442 U.S.

510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that in a criminal case where intent was an issue, a jury charge that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violates fourteenth amendment due process because it shifts the burden of persuasion on the element of intent to the defendant. The facts were these: Defendant Sandstrom was charged with "deliberate homicide." He confessed. At trial his counsel stated to the jury that his client had killed the victim but argued that he did not do so "purposefully or knowingly"; therefore, he was guilty of a lesser crime. Two expert witnesses had testified to defendant's mental state at the time of the killing. Counsel argued to the jury that defendant's personality disorder plus alcohol consumption resulted in his not having killed the victim "purposefully and knowingly." Over objection, the trial judge gave the above-mentioned charge regarding a presumption of intent.

In *Tyler v. Phelps*, 643 F.2d 1095 (5th Cir. 1981) (on rehearing), *vacating opinion* at 622 F.2d 172 (5th Cir. 1980), the Court followed *Sandstrom* in finding a similar charge unconstitutional in a habeas corpus case. Petitioner Tyler had been convicted under a section of Louisiana's first-degree murder statute which defines as first-degree murder the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The shooting occurred when Tyler fired a pistol from a school bus into a crowd of students who, in connection with a racial disturbance, were throwing rocks and jeering at the students on the bus. The trial court charged the jury that "the law provides that a person intends the ordinary consequences of his voluntary acts." The Fifth Circuit's opinion in *Tyler* characterizes the question of Tyler's specific intent as a "primary issue" at the trial. *See Tyler, supra*, at 1099.

There is a question as to whether the holding of *Sandstrom*, which was decided in 1979, applies to Petitioner's case since he was tried in 1974. Thus far, this question has not been resolved in this Circuit. In *Tyler*, the Court of Appeals found it unnecessary to resolve the issue because it found that the particular charge involved in the *Tyler* case was unconstitutional under another Supreme Court decision predating the *Tyler* trial, *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Therefore, the question of whether *Sandstrom* is to be retroactive remains unresolved. This Court chooses not to rule upon this issue, since it is unnecessary for the reasons shown hereinafter.

■ The objected-to charge is quite similar to those struck down in *Sandstrom* and *Tyler*.[10] After *Sandstrom*, the Georgia Su-

---

10. The Court does note that the charge is arguably internally inconsistent. It first instructs the jury that intent is presumed under certain circumstances but then goes on to say that criminal intention cannot be presumed. *But cf. Kramer v. State*, 230 Ga. 855, 199 S.E.2d 805 (1973) (upholding similar inconsistency), *overruled* on other grounds in *Hosch v. State*, 246 Ga. 417, 271 S.E.2d 817 (1980). Any ambiguity does not aid the State, however, since it cannot be said with any degree of certainty which part of the charge the jurors deemed controlling.
    The Court also notes that the jury was instructed the presumption could be rebutted, an element apparently not present in *Sandstrom*. Further, the Georgia Supreme Court has ruled that charges on rebuttable presumptions in criminal cases do not shift the burden of persuasion. *See State v. Moore*, 237 Ga. 269, 270, 227 S.E.2d 241, 242 (1976); *Washington v. State*, 142 Ga.App. 651, 236 S.E.2d 837 (1977). This is consistent with Georgia's approach that factual presumptions are evidence for the jury to consider, even where evidence opposing the presumption has been adduced. *See generally*, Agnor, W. H., Agnor's Georgia Evidence, § 17–8 (1976 ed. and 1980 Supp.). However, in the Court's opinion, it would be inconsistent with the Court of Appeals' decision in *Tyler* to characterize the instant presumption other than as a burden-shifting presumption. In *Tyler*, the jury was charged that the presumption continued until it was "outweighed," otherwise the jury was bound to find in accordance with the presumption. *Tyler, supra*, at 1099. The Court found this charge shifted the burden of persuasion. Leaving aside legal niceties not apt to be appreciated by a jury, the Court sees the only difference between the *Tyler* charge and that presented here as one of degree. The *Tyler* charge emphatically directed the jury to follow the presumption unless it was outweighed by other evidence; the instant charge

preme Court specifically disapproved its further use in Georgia courts. *Hosch v. State*, 246 Ga. 417, 271 S.E.2d 817 (1980). If the language of the charge is the controlling factor here, Petitioner's attack may well be meritorious. However, the Court finds that under the somewhat unique facts presented here, the language of the charge is not the controlling consideration.

■ In the Court's opinion, the trial strategy employed by Petitioner more radically relieved the State of its burden of persuasion than did the court's charge on the rebuttable presumption of intent. Knowing that the State's evidence was overwhelming and highly inflammatory, and taking into account the fact that the trial jury would also be the sentencing jury—Petitioner made a decision to admit guilt, and garner whatever sympathy could thereby be obtained. In his opening statement and his closing argument, Petitioner's counsel stated to the jury that his client was guilty. At one point in the closing argument, he stated that his client was "guilty of the crime of murder" although at a subsequent point the suggestion was made "maybe he's guilty of manslaughter." Viewing defense counsel's remarks most favorably to Petitioner, defense counsel was

still inviting the jury to find his client guilty of voluntary manslaughter, which in Georgia includes the element of intent (though not malice aforethought) just as does first-degree murder.[11] Given Petitioner's admission, and the fact that neither counsel's argument, statements to the court nor any questions to any of the witnesses even remotely hint that Petitioner considered intent to be disputed, the Court finds that Petitioner's conduct so effectively aided the State in meeting its burden of persuasion on the issue of intent that he cannot now be heard to complain of the mildly burden-shifting effect of the charge involved here.[12] Thus, Petitioner was not prejudiced by the charge.

■ The implication of the foregoing is two-fold. First, under the precedent of this Circuit, an erroneous jury charge will support collateral attack on the state court judgment only if the charge "so infected the trial as to render it fundamentally unfair." *Tyler, supra*, at 1100. Here, for the reasons just stated, the Court finds that the charge did not render Petitioner's trial fundamentally unfair. Secondly, it is possible in limited circumstances for constitutional error to be harmless. The Court holds this is one of those instances.

stated the same thing less emphatically and with no accompanying instruction that the presumption was merely evidence for the jury to consider. Therefore, since the *Tyler* charge was held to shift the burden of persuasion, the Court concludes this one did too.

Even if it is not viewed as altering the basic allocation of the burden of persuasion, a charge flatly stating that the "law presumes" any fact is objectionable where it gives a heavy-handed assist to the party favored by the presumption in meeting its burden of persuasion. The particular presumption involved here is nothing more than a statement of what any juror would know instinctively anyway. Thus, it imparts no helpful legal principle to the jury, while lending the court's qualified endorsement to the prosecution's case on the element of intent.

11. Voluntary manslaughter is defined as follows:

A person commits voluntary manslaughter when he causes the death of another human being, under circumstances which would otherwise be murder, if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasona-

ble person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

Ga.Code Ann. § 26–1102 (1977 rev.).

Involuntary manslaughter is defined as follows:

(a) A person commits involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so, by the commission of an unlawful act other than a felony.

Ga.Code Ann. § 26–1103 (1977 rev.).

12. As noted in the statement of facts, Petitioner's counsel did ask the trial court to charge the jury on his client's right to stand silent, which the court did. However, the Court reads this as being consistent with Petitioner's strategy to make the jurors feel as sympathetic as possible toward him personally, since the same jury would be one deciding the sentence.

In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held that before constitutional error can be held harmless, it must be shown to be harmless beyond a reasonable doubt. Here, Petitioner argues that a burden-shifting charge on an element of a crime can never be harmless error. This question was not resolved by the Supreme Court in the *Sandstrom* decision, but rather was expressly left open. *Sandstrom, supra,* 442 U.S. at 526–27, 99 S.Ct. at 2460–2461. In *Hammontree v. Phelps*, 605 F.2d 1371 (5th Cir. 1979), the Court of Appeals for the Fifth Circuit held that a burden-shifting charge required reversal of the district court's denial of the writ of habeas corpus, even though there was evidence in the record independent of the tainted presumption to sustain the conviction. The Court of Appeals held that the failure to give a proper charge was not harmless, "since the verdict might have resulted from the incorrect instruction." *Hammontree, supra,* at 1380, *quoting United Brotherhood of Carpenters & Joiners v. United States*, 330 U.S. 395, 409, 67 S.Ct. 775, 782, 91 L.Ed. 973 (1947).[13]

This Court interprets the *Hammontree* decision to mean that mere weight of the evidence with respect to an element of a crime cannot cure a facially (unconstitutionally) deficient charge on that element. Here, however, more than the weight of evidence is involved. As noted, Petitioner's own trial strategy negated the materiality of intent as an issue. The Court finds beyond a reasonable doubt that the error in the charge was harmless. This finding is based on his counsel's statements as to his guilt, together with a review of the entire trial transcript which reflects no conduct of Petitioner or his counsel inconsistent with Petitioner's admissions of guilt, and abundant evidence to support a finding of intent.

**B. Admissibility of Petitioner's Confession**

The Court adopts the full and accurate statement of facts pertinent to Petitioner's arrest and confession, as set forth in the Magistrate's Report and Recommendation of January 9, 1980, pp. 5–11. For convenient reference, the statement of facts is set out herein as follows.

\* \* \* \* \* \*

At 1:00 a. m. on January 19, 1974, Sheriff Earl Lee of Douglas County, Georgia, received a telephone call from an informant whom he had known for five years (FT–II–104, 116).[14] Lee knew that a woman's body had been found in nearby Clayton County (FT–II–131). As a result of what the informant—she has identified herself as Sandy—said to Lee on the telephone, he hurried to his office to meet her. She wanted to talk about the murder of the girl, Donna Marie Dixon. Lee taped her statement (FT–II–117–18). In the statement Sandy told Sheriff Lee what she had found out about the circumstances of the murder of the girl whose body had just been discovered in Clayton County. She was told about it by a waitress at the Aquarius Lounge. She knew her as Bonnie (FT–II–126). Bonnie had said that Wes, her live-in paramour, killed the seventeen-year-old white female because she had given some money belonging to Wes and a friend of his to her colored pimp (FT–II–126). Sandy told the Sheriff that she knew exactly where Wes and Bonnie could be found provided they were picked up before 4:00 a. m. (FT–II–127). Although she did not know where Bonnie and Wes lived, she knew that Bonnie worked at the Aquarius Lounge and that Wes hung out at Mike's, right next door to Peaches, with the Outlaw motorcycle gang (FT–II–127). All of these establishments are in the Peachtree-Tenth Street area of Atlanta, Georgia, a locale commonly referred to as "The Strip." Sandy related

**13.** The Court notes headnote No. 8 stating that "[a]n unconstitutional jury instruction on an element of the crime can never constitute harmless error." *Hammontree, supra,* at 1372.

This headnote, of course, is not a part of the Court of Appeals' opinion.

**14.** Reference is to the transcript of the hearing held by the Magistrate.

that Bonnie worked at the Aquarius only on weekends (FT–II–130). She described Wes as being from California and said that Wes and Bonnie lived in a house in Atlanta (FT–II–129, 132). Sandy had seen Wes and Bonnie together on the Thursday night that Bonnie had told Sandy of the murder. When they met, Wes at first acted as though he were afraid (FT–II–134, 137). Wes left the bar, but the conversation between Sandy and Bonnie continued.

Bonnie's story of the killing, as related to Sandy, was full of detail. In addition to providing an insight into the motive (FT–II–126), she stated that she had witnessed Wes torture, sexually assault, and beat the female and then strangle her and push her head back hard to break her neck (FT–II–127). Bonnie further told Sandy that after Wes had killed the girl, he broke both of her arms and legs so that the body could be fitted into a trunk (FT–II–136). Sandy believed Bonnie because she appeared to be scared as she told her story (FT–II–136). Sandy's brother had accompanied her to the Aquarius Lounge. At one point Bonnie asked that the brother help Wes load the body (FT–II–137). Later, Bonnie called her home and came back and told Sandy that Wes and another were taking the body out of the apartment then (FT–II–138). She added that it was supposedly being taken somewhere around the Atlanta Airport, which is partially in Clayton County (FT–II–128, 131).

Prior to furnishing this information, Sandy had provided the Sheriff with information which on more than one occasion had resulted in prosecution. In one burglary case, her information had resulted in the issuance of a search warrant which was used to recover stolen property. At other times the information was found good for leads and so forth (FT–II–141, 144).

After the debriefing of the informant was concluded, Lee contacted the Atlanta Police Department and the Clayton County Police Department and arranged a meeting in Atlanta. He came quickly to Atlanta and played the tape for the detectives in

the office of Sgt. Pharr of the Atlanta Police Department (ST–B–196) [15] (FT–II–156, 163–64). After Pharr listened to Sheriff Lee's tape, he told Detective Landrum to go to the "strip" area and see what he could find out (ST–B–197). Pharr testified that he felt that the information he had was enough to ask Landrum to bring Wes in for an interview, but he said he did not feel that he had sufficient evidence for a warrant (ST–B–196–198).[1]

Det. Landrum recalled that he was called into Pharr's office at about 2:30 a. m. and told that an informant of Sheriff Lee had provided information that the homicide presently being handled by the Clayton County Police Department had occurred in the City of Atlanta. Further, he was told that according to this information, the people involved went by first names of Wes and Bonnie (ST–B–211). Landrum said he was asked to go to the "strip" to see if he could find out any further information about the case. Landrum had worked the "strip" area a lot and was familiar with two people having these first names. He had once spoken to Wes on the telephone (ST–B–212, 215).

When Landrum arrived in the "strip" area, he spoke with an informant of some one and a half year's acquaintance. The source told him that Bonnie Succaw and Wes McCorquodale had perpetrated the homicide. Further, the informant said that the murder had occurred at Bonnie's apartment on Moreland Avenue in Atlanta (ST–B–212). He added that he had seen McCorquodale on the strip that night. In about 15 or 20 minutes he located McCorquodale at Peaches Lounge and identified him for the detective.

Landrum and another officer approached McCorquodale and told him that they would like to talk to him down at the police station (ST–B–213). Landrum said that McCorquodale asked why they were interested in him and was told that it concerned the homicide. Landrum testified at the motion to suppress hearing in state court that

McCorquodale then voluntarily came with the officers and that he was not handcuffed (ST–B–214). En route, McCorquodale was advised of his constitutional rights (ST–B–226). All this occurred after 2:30 a. m. (ST–B–226).

Landrum and McCorquodale arrived at the police headquarters at about 3:00 a. m. (ST–B–193). A warning and waiver of rights form was filled out. Detective Scappoticio went over it with the defendant, and it was signed by the petitioner (ST–B–187). When McCorquodale appeared before Sgt. Pharr in the detective's office, the sergeant saw what he thought were blood stains on the petitioner's clothing, and so he instructed Scappoticio to remove the clothing (ST–B–195). The police officers tried to find clothing for McCorquodale, but since the available garments were too small, so [sic] he was given a blanket (ST–B–188).

After Landrum arrived at the station with McCorquodale, Sgt. Pharr instructed him to go back out to the "strip" and pick up Bonnie Succaw (ST–B–216). He located Mrs. Succaw, and they returned to the police station where she gave a complete statement (ST–B–216). During this time McCorquodale was seated with Pharr and other officers in another area (ST–B–216).

At the time that McCorquodale was taken in, he had been drinking. Landrum said that petitioner had a can of beer in his hand when he first saw him (ST–B–228). He and other officers smelled the odor of alcohol on McCorquodale (ST–B–161, 204, 227). In Landrum's opinion, McCorquodale was not drunk (ST–B–228), although McCorquodale denied being entirely sober (ST–B–243). During the state motion to suppress hearing he said that he had had three or four mugs of tequila that night (ST–B–242). However, at the federal habeas hearing he testified to having four or five beers plus two beer mugs full of tequila and ice (FT–III–55).

McCorquodale admitted that he was able to walk into the police station under his own power and that he sat up by himself (ST–B–249). He said that he voluntarily removed his clothes when asked to do so

and also gave the statement voluntarily (ST–B–243, 245). To Pharr he appeared cool and collected (ST–B–208).

After Succaw gave the statement, Landrum talked to McCorquodale again, and at that point, the petitioner asked to speak to the detective alone (ST–B–156, 660). When the other officers had left the room, McCorquodale told Landrum that he had killed the girl. He made this simple assertion and then went into the details of how he had killed her and generally what had transpired at the apartment (ST–B–220, 661). While McCorquodale was giving his verbal statement, there were no other distractions (ST–B–661). Then a typist was called in, and a written statement was prepared. During this time McCorquodale's conversation drifted, and he and Landrum talked about a number of things. He asked to see Bonnie, and Landrum told him that he could as soon as they got through with the preparation of the written statement (ST–B–252).[2] During the time that the written statement was being dictated, both McCorquodale and Landrum had several cups of coffee, and they played blackjack with a deck of cards that was found in the desk. Landrum said that this seemed to relax McCorquodale (ST–B–221).

A few final facts pertinent to McCorquodale's arrest and the introduction of his statement should be noted. At the federal habeas hearing before the Magistrate, Diane Alyse Singleton testified that she had been with McCorquodale at the time that Landrum took him from Peaches Lounge. She said that he was handcuffed by the officers prior to being taken from the area (FT–I–180). Also at this hearing Landrum for the first time characterized his confrontation with McCorquodale at the lounge as an arrest.

---

[1] This opinion of Sgt. Pharr was elicited by defense counsel on cross-examination during the state motion to suppress hearing.

[2] McCorquodale said that he did not give any statement until he was told that he could not see Bonnie until he did.

\*     \*     \*     \*     \*     \*

Magistrate's Report and Recommendation, January 9, 1980, at 6–11.

Petitioner contends that his confession was wrongfully admitted at trial. He argues that his statement to the police was inadmissible because it was obtained as the direct result of an unlawful arrest and also because his statement was involuntary in light of the circumstances under which it was obtained. He alleges that his warrantless arrest was unlawful because it lacked probable cause. The record indicates that there is some uncertainty as to whether Petitioner was actually "arrested" before he was taken to the police station or whether he was taken to the police station only for questioning. However, as Petitioner points out, the Supreme Court held in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), that whether a formal arrest has occurred or not, the police must have "probable cause" before taking an individual involuntarily to the police station for questioning because such police conduct constitutes a "seizure" for fourth amendment purposes. This Court agrees with the Magistrate in finding that there was sufficient probable cause to justify the taking of Petitioner into custody without a warrant as allowed under *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) and cases cited therein. The decision to take Petitioner into custody was based on information received from two police informants acting independently. The first informant who contacted the police had provided reliable information in the past and on this occasion gave specific details concerning the crime and the possible suspects to the police. The second informant, also known by the authorities and a past source of information, told the police who had committed the crime and where it had occurred, and then led them to Petitioner and identified him. Under these circumstances, the informants proved themselves credible and their information reliable as required by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Although the information provided by either informant alone may not have been enough to create probable cause, in conjunction with the information provided by the other informant, the total effect was sufficient to establish the required probable cause. *See United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978).

Having determined that the seizure of Petitioner by the police was lawful, the Court must now decide whether Petitioner's confession was voluntary under the circumstances in which it was obtained. The Petitioner had been drinking immediately prior to his being taken into custody by police. Although he testified that he had four or five beers as well as two mugs of tequila and ice, there is no testimony indicating the effect of his alcoholic intake on his voluntariness. There is no indication of the length of time Petitioner had been drinking, and although he testified that he was not entirely sober, he did admit that he was able to walk into the police station under his own power and that he was able to sit up without assistance. Petitioner had been informed of his rights prior to questioning as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he indicated at trial that he had given his oral statement voluntarily. The police, noticing what appeared to be bloodstains on his clothing, requested that he remove his clothing and at trial Petitioner admitted that he had complied with said request voluntarily. He was given a blanket to put around himself which he kept on for at least four hours while he remained at the police station. While Petitioner was there, the police brought in his girlfriend, Bonnie Succaw, for questioning, during or after which she began to weep in his presence. During the preparation of Petitioner's written statement, he asked to see Bonnie and was told that he could not see her until preparation of his written statement was complete.

*Jurek v. Estelle*, 593 F.2d 672 (5th Cir.), *rev'd on other grounds on rehearing*, 623 F.2d 929 (5th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) and *cert. denied*, 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981), provides the proper analysis for the "voluntariness" of Petitioner's confession in this case. In *Jurek*, the Court recognized

that all police questioning has a coercive element but that such questioning results in constitutionally involuntary answers only when the pressure on the defendant to give an answer becomes too insistent. There are two improper aspects of such pressure; it may result in unreliable answers and it may offend the principles underlying the fifth amendment's self-incrimination clause by coercing the defendant to speak against his or her will. As the Court in *Jurek* noted, an examination of these two aspects in determining voluntariness must be based on the effect of the totality of the circumstances on the defendant's will. This Court finds that the circumstances in the present case did not undermine the reliability of Petitioner's statement. Petitioner did not have any mental handicaps or lack of intelligence that would make him particularly susceptible to the influence and suggestions of others. Nor was Petitioner's drinking prior to his being seized by the police of such magnitude as to limit his thought processes while he was at the police station, as evidenced by his demeanor at the station and his ability to give a detailed description of the events surrounding the crime. The totality of the circumstances therefore did not cause Petitioner's statement to be unreliable and his confession was in fact reliable.

There remains the question of whether the confession was freely given. Petitioner argues that the circumstances surrounding his custodial interrogation overwhelmed his will and coerced him into making his confession. The Court has noted that Petitioner's mental faculties at the police station were not hindered by his consumption of alcohol during some period of time prior to his being taken into custody. His arrest or "seizure" has been found by this Court to have been lawful. The intermittent questioning of Petitioner over a period of several hours by different police officers was not excessive or abusive and does not come close to the coercive pressures found in *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Jurek, supra*, 593 F.2d 672. In

*Reck*, the 19 year old defendant was mentally retarded and confessed to participation in a murder after being held incommunicado and interrogated by groups of police officers for nearly four days while sick and faint and inadequately fed. The defendant in *Jackson* confessed at a hospital after considerable loss of blood and soon after he had been given drugs. In *Jurek*, the defendant had limited verbal intelligence, was arrested at one o'clock in the morning and taken from his home without a shirt or shoes, was kept from his family and not given an attorney for at least forty-two hours, was moved amongst three towns several times during that period, and was not brought before a magistrate until twenty-one hours after his arrest.

The additional factor in the present case of Petitioner's having to remove his outer clothing and being given only a blanket with which to cover himself for the four or five hours he was at the police station does not contribute to any potentially coercive atmosphere. Petitioner does not allege that the police requested his clothing for the purpose of making him feel vulnerable nor does he assert that the taking of his clothing caused him such discomfort that his resistance was weakened. In fact, the police had a legitimate reason for wanting his clothing, to test the apparent bloodstains, and it appears that they would have given him other clothes to wear but they had nothing that would fit him.

█ The other circumstances raised by Petitioner do not, in conjunction with those already mentioned, create a coercive atmosphere. The failure of the police to immediately or promptly take Petitioner before a magistrate or other convenient officer for issuance of a warrant was not coercive. Ga.Code Ann. § 27–212 (1978 rev.) requires that in a case of a warrantless arrest the offender must be taken before the most convenient officer "without delay" for issuance of a warrant, but under Georgia law the fact that this statutory provision is not complied with does not of itself render an otherwise voluntary confession inadmissible. *See Blake v. State*, 109 Ga.App. 636,

137 S.E.2d 49, *cert. denied sub nom. Blake v. Georgia,* 379 U.S. 924, 85 S.Ct. 281, 13 L.Ed.2d 337 (1964). Although the Supreme Court cases cited by Petitioner do indicate that failure to take an offender arrested without a warrant before a magistrate within a reasonable amount of time after the arrest is a factor to be considered in determining voluntariness of a confession, those cases involved lengthy delays before the defendant confessed. *See Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); and *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). Petitioner made his statement to the police after being in custody for several hours and not half a day or longer as in the other cases. The delay in the present case was not of sufficient magnitude to weaken Petitioner's resistance. The Supreme Court of Georgia, in *McCorquodale v. State, supra,* noted that Petitioner waived his right to a commitment hearing in this case.

This Court also finds that the playing of cards between one of the police officers and Petitioner during the period of questioning and the intermittent questioning by a variety of police officers over several hours was not of such effect that "in weighing the totality of the circumstances," Petitioner was unable to make "an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Jurek v. Estelle,* 623 F.2d 929, 937, 941 & n.7 (5th Cir. 1980) (en banc), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) and *cert. denied,* 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981).

The Court finds further that the questioning of Bonnie Succaw in the presence of Petitioner prior to his written statement did not constitute an improper influence or a direct or implied promise that would destroy the voluntariness of Petitioner's confession. His written confession after Bonnie gave the police her statement cannot be viewed as an effort to exonerate Bonnie nor can her presence be seen as an improper inducement for his statement. Petitioner did not request to see Bonnie or talk to her until she had already arrived at the police station and he had verbally confessed. Therefore the refusal by police to allow Petitioner to talk to Bonnie until his oral statement had been put into writing had no effect on his decision to confess. This Court finds that Petitioner's statement was not only reliable but was also freely given considering the totality of the circumstances and therefore, under *Jurek, supra,* 623 F.2d 929, was voluntary and admissible.

II.   Petitioner's Sentence

A.   Propriety of Jury Selection

Petitioner attacks his death sentence by alleging that at least seventeen prospective jurors were systematically removed from his jury panel due to their conscientious views against capital punishment, such removal being in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777. However, the Court in *Witherspoon* did note the following:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n.21, 88 S.Ct. at 1777 (emphasis in original).

The challenged portion of jury selection proceeded as follows:

(Questioning of prospective jurors by counsel for the State)

Ladies and gentlemen, I want to address to you now, three questions and if your answer to the first question is, yes, will you please stand. If your answer to this question is no, will you please remain seated.

The question is this. Are you conscientiously opposed to capital punishment? If you're conscientiously opposed to capital punishment, if you will, please stand. If you are not conscientiously opposed to capital punishment, remain seated.

All right, now all the jurors who are conscientiously opposed to capital punishment, please stand. Now ladies and gentlemen, those of you who are standing, those who are standing and who have indicated by doing so that you are conscientiously opposed to capital punishment, I'd like to address to you two additional questions. If your answer to either of these questions is, yes, I'd like to, if you would, please simply step up to the rostrum.

If your answer is no to both questions, then please remain where you are.

The first question is this. Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case, regardless of what the evidence was?

MR. RIDLEY: I object. That's not a proper question.

MR. ENGLAND: Yes, it is a proper question, if your Honor please.

If your answer is yes to the question, please step forward to the rostrum.

Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case regardless of the evidence?

And would the others still remain standing; those who are standing.

Let me address this last question to the other ladies and gentlemen who were standing. Everybody who was standing.

THE COURT: This is addressed to the ones who are standing, but who have not come forward?

MR. ENGLAND: This is addressed to every juror who has not come forward but who has indicated by standing, that you are conscientiously opposed to capital punishment.

The question is this. Would you allow your opinion about capital punishment to prevent you from being a fair and impartial juror on the issue of guilt or innocence as distinguished from the issue of punishment? If you would, would you please step forward.

If your Honor please, in relation to these ladies and gentlemen who have stepped forward in response to the questions, I would respectfully move to the Court that they be allowed to be excused for cause.

MR. RIDLEY: If the Court please, to which we would object to their being excused. We make the objection for each and every juror who is standing, the same objection; we would object to them being excused for cause.

THE COURT: Overrule such objection.

(Tr. 278–81).

Petitioner made no request to question the jurors before they were excused.

■ Petitioner contends this method of identifying those jurors who will not, under any circumstances, impose the death penalty is improper. Specifically, he contends that a nonverbal mass response to questions about capital punishment does not make it "unmistakably clear" that each responding juror will automatically vote against the death penalty. Petitioner claims *Witherspoon* requires individual questioning of each juror by the court or counsel.

Assessment of Petitioner's argument, in the Court's view, primarily turns on one's assessment of human nature, including interpretation of how jurors tend to act during jury selection. In the Court's experi-

ence, the courtroom setting tends to reinforce the inclination of most people not to single themselves out in a group setting. Given this observation, the Court believes it does take some measure of conviction for a juror to stand in announcement of his conscientious objection to the death penalty, at least in those cases where the number of jurors responding (standing) is not so great in proportion to the total number present that there is tacit pressure to join the standing group. Although the transcript does not indicate the precise number of jurors who were present during jury selection, the Court deduces that it was something in excess of 60 persons (Tr. 276–446).[16] Nineteen persons rose in response to the prosecution's initial request for all opposed to capital punishment to rise. Four of these ultimately decided that they could, under some circumstances, impose the death penalty and thus they were not stricken for cause.

Taking into account the numerical ratio involved here, and the fact that the State's two follow-up questions to the standing jurors required those opposed to the death penalty to take further positive action (*i. e.* stepping forward again) to declare their opposition to the death penalty, the Court finds that the procedure is not deficient under *Witherspoon*. While it would have been error for the trial judge to refuse Petitioner the opportunity to further voir dire the standing jurors, it was not error for the court to fail to conduct an individual voir dire of the standing jurors. In summary, the Court finds that the fifteen jurors who were excused did make it "unmistakably clear" that they would vote against the death penalty no matter what the evidence showed.

■ Petitioner further claims that two particular jurors, Miss Sylvia Woodlief and Mr. Allen Kidd, were improperly excused after individual voir dire of each of them was conducted by the prosecution. Neither

of these jurors had stood earlier in response to the questions discussed above.

The colloquy with Miss Woodlief was as follows:

BY MR. ENGLAND:

Q Miss Woodlief, you say you're what?

A I'm a sales representative for Gillette.

Q The razor blade company?

A Yes.

Q Have you served before on a jury in a criminal case this week?

A This week.

Q Do you recognize anyone at the other table?

A No.

Q Would you be fair and impartial in this case, go by the evidence and the law, let your verdict speak the truth on that basis?

A Yes.

Q Do you really believe in capital punishment?

A No.

Q You don't?

A No, I don't. It's different being faced, you know, discussing capital punishment and sending someone to the electric chair.

THE COURT: You didn't understand the question that was posed to you awhile ago?

THE JUROR: Yes, I did at that time. I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, I don't think I could do it, I really don't.

THE COURT: All right, Mr. Ridley. That's grounds for excusal for cause.

You may be excused. (Tr. 400–01)

The colloquy with Mr. Kidd immediately followed that with Miss Woodlief and was as follows:

BY MR. ENGLAND:

Q Mr. Kidd, I couldn't tell where you worked.

---

**16.** Three jurors were excused for bias based on prior knowledge of the facts of the case; 15 were excused for cause based on inability to impose the death penalty; 49 jurors were then individually questioned prior to selection of the jury. The record is silent as to whether additional prospective jurors, who did not participate in voir dire, were present.

A Powell View Company.

Q A nursing home?

A Yes.

Q Have you served before in a criminal case?

A No.

Q Do you recognize anybody at the other table?

A No.

Q Would you be a fair and impartial juror in this case and just let your verdict speak the truth based on the evidence that comes out in court and the law that his Honor gives you?

A Yes.

Q Do you really believe in capital punishment?

A To a certain extent.

Q To a certain extent?

A Yes, sir.

Q Do you feel there are cases where under the evidence it would be a right and just verdict?

A Well, in a way.

Q Well, when it comes down, like the last lady said, from a theoretical point to where a juror would be asked to vote, do you think you could really never vote for the death penalty no matter what the evidence was?

A No, sir.

Q You don't think you could?

MR. ENGLAND: If your Honor please, I believe it should be excused for cause.

THE COURT: You say you never could vote for it regardless of the circumstances?

THE JUROR: No, sir.

THE COURT: Did you hear the question that was posed to you just awhile ago? Did you understand the question?

THE JUROR: No, I did not understand.

THE COURT: You could not under any circumstances vote for the death penalty?

THE JUROR: No.

THE COURT: Is that right, under any circumstances?

THE JUROR: No.

THE COURT: In that case, you may be excused.

MR. RIDLEY: May the same objection be noted?

THE COURT: Yes. (Tr. 402–04)

In the Court's opinion, both of these jurors ultimately did make it unmistakably clear that they could not vote for the death penalty. Though they indicate some initial equivocation, the "bottom line" is unequivocal. Further, the Court knows from observing voir dire that the trial judge often must make judgments as to whether or not a prospective juror really means it when he says something. This Court believes some deference is due the judgment of the trial judge, who heard these two jurors as they stated that their reconsidered positions were that they could not impose the death penalty under any circumstances. Therefore, the Court rejects Petitioner's argument that Miss Woodlief and Mr. Kidd were improperly excused, as the Court does find that they made their respective positions unmistakably clear.

■ Petitioner also claims he was entitled, under the sixth and fourteenth amendments, to select from among those prospective jurors who admittedly were unalterably opposed to the death penalty. He says his right to select from a group representing a true cross-section of the community has been abridged. This argument has been ruled upon adversely to Petitioner in *Spinkellink v. Wainwright*, 578 F.2d 582, 596 (5th Cir. 1978), *cert. denied, Spenkelink v. Wainwright*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), and thus is rejected.

B. Discriminatory and Arbitrary Application of the Death Penalty

■ Petitioner recognizes that in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court held that the present Georgia statutory system under which Petitioner was sentenced to death is constitutional on its face. Petitioner argues instead that the Georgia death penalty statute, Ga.Code Ann. §§ 27–2503, –2534.1, is unconstitutional in its enforce-

ment because it is discriminatorily and arbitrarily applied in several ways. He contends that discrimination based upon the race of the offender and upon the race of the victim substantially influences the imposition of capital sentences in Georgia and that the arbitrary factors of race and geography play a significant role in the imposition of capital sentences in Georgia. Specifically, Petitioner asserts that there is a much greater likelihood of receiving the death penalty if the defendant is white, if the victim is white, or if the defendant is convicted and sentenced in certain regions of Georgia rather than other areas of the state.

At an evidentiary hearing held before the Magistrate, Petitioner offered certain statistical data and other evidence calculated to prove these contentions. The Magistrate ruled most of the statistical charts inadmissible but certain related oral testimony was admitted. As is more fully set forth in the Court's Order of even date herewith on Petitioner's Motion for a Further Evidentiary Hearing, the Court finds that such evidence is irrelevant to any issue before the Court, under the standards set forth in *Spinkellink, supra.* There, the Court held that where a state's sentence review system is constitutional on its face, a federal habeas court should not weigh evidence of discriminatory or arbitrary application of the death penalty, *unless* the circumstances of petitioner's case are such that petitioner is "so clearly undeserving of capital punishment that to impose it would be patently unjust and would shock the conscience ...," or where "petitioner can show some specific act or acts evidencing intentional or purposeful racial discrimination ..." *Id.* at 606 n.28, 614 n.40. Petitioner's case is not one where the facts show he is so clearly undeserving of capital punishment that to impose it would be patently unjust and shock the conscience. Also, as noted in the Court's Order on Petitioner's motion for a further evidentiary hearing, no inference of intentional or purposeful racial discrimination is appropriate here either on the proffered or actually admitted evidence. This is true even if Petitioner's evidence shows

exactly what Petitioner claims it does, namely, gross statistical disparity between defendants receiving the death penalty where the victim is white and defendants receiving the death penalty where the victim is black. Such disparity, if it exists, indicates no form of intentional or purposeful discrimination against Petitioner.

### C. Closing Argument by Prosecution

▮ Petitioner argues that a remark made by the prosecutor during the closing argument to the jury at the sentencing phase of the trial made that hearing fundamentally unfair in violation of due process. The remark in question is as follows:

> But, you have a contribution to make. A vital contribution which you are now considering and will be deliberating on. And after your decision, the Appellate Court will have a very important responsibility. (Tr. 766).

Counsel for Petitioner immediately objected to the remark concerning the Appellate Court and moved for a mistrial. The trial court denied the motion and gave the jury the following cautionary instruction:

> Now ladies and gentlemen, this portion of the argument is proper, and I quote and unquote. ["]But you have a contribution to make, a vital contribution which you are now considering and will be deliberating on.["]

> This portion of the argument made by the District Attorney is highly improper and I quote. ["]And after your decision the Appellate Court will have an important responsibility.["] End of quote.

> Now ladies and gentlemen, I urge this brief instruction, that you eliminate from your minds any consideration whatsoever respecting that particular portion of the District Attorney's argument, ladies and gentlemen. Give it no consideration whatsoever, insofar as you are concerned as jurors. This case is concluded when you return your verdict. As a matter of fact, theoretically, insofar as this court is concerned, it is concluded, ladies and gentlemen. Give that remark no consideration whatsoever. Eliminate it from your

minds as though it was never made and ladies and gentlemen, again, I would request to be very assured, to disregard what is a highly improper remark. (Tr. 770–71).

In giving this instruction the trial court recognized the impropriety of the prosecution's remark and hoped to cure any prejudice that it may have caused.

This Court must determine whether the cautionary instruction had a sufficient curative effect. In *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the Court held that certain remarks by the prosecution during closing argument, taken in the context of the entire trial, were not sufficiently prejudicial to violate the defendant's due process rights. The decision in *Donnelly* was based primarily on the effect of the state court's instruction that the prosecutor's remark was improper and should be disregarded. With respect to the cautionary instruction in *Donnelly* the Court said:

> In addition, the trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case. The prosecutor, as is customary, had previously told the jury that his argument was not evidence, and the trial judge specifically re-emphasized that point. Then the judge directed the jury's attention to the remark particularly challenged here, declared it to be unsupported, and admonished the jury to ignore it. Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character.

416 U.S. at 644, 94 S.Ct. at 1872. The Fifth Circuit has also indicated that in determining the prejudicial effects of remarks made during summation the court must look at the context of the entire hearing in which the remarks were made. *See Cronnon v. Alabama,* 587 F.2d 246 (5th Cir. 1979), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792; *Alvarez v. Estelle,* 531 F.2d 1319 (5th Cir. 1976), *cert. denied,* 429 U.S. 1044, 97 S.Ct. 748, 50 L.Ed.2d 757 (1977).

Within the context of the sentencing hearing in the present case, this Court finds that the trial judge's instruction was sufficient to cure or erase any harm or prejudice caused by the prosecution's remark. The improper remark in this case was "[a]nd after your decision, the Appellate Court will have a very important responsibility." The magnitude of any harm caused by such a remark pales in comparison to the improper remark which served as a ground for reversal in *Prevatte v. State,* 233 Ga. 929, 214 S.E.2d 365 (1975). In *Prevatte,* the district attorney made the following comments to the trial court in the presence of the jury:

> Your Honor, please, the other, the fifth thing is that the trial court, yourself, your Honor, you have the right even if the jury should recommend death of your own accord to reduce it to a life sentence if you saw fit. Sixth, there is now an automatic appeal which provides that the case go to the Supreme Court of Georgia, where they consider not only the evidence of guilt, but whether or not the evidence in that case warrants the death sentence, they, of their own accord from reading the record have the right and they have already done so in one particular case, to set aside the death sentence and set a life sentence for the offense of murder.

233 Ga. at 931, 214 S.E.2d at 367.

The comment in the present case was very brief and its meaning fairly ambiguous. The effect, if any, it had on the jury's view of their responsibility in sentencing was corrected by the court's instruction, which was as thorough as that given in *Donnelly, supra.* Therefore, no prejudice resulted and due process was not violated.

**D. System of Appellate Review**

Petitioner argues that Georgia's system of appellate review in capital cases operated to deny him the effective assistance of counsel, a fundamentally fair and reliable review of his death sentence, and his right not to suffer cruel and unusual punishment. He gives the following reasons for this argument: (1) the review pro-

cedures are inadequate and unfair as shown by an analysis of the Georgia Supreme Court's performance in sentence review; (2) there is a lack of access by capital defendants to relevant sentence review materials; and (3) the public statements of the Chief Justice of the Georgia Supreme Court indicate his lack of objectivity in reviewing death sentences.

Under Ga.Code Ann. § 27–2537 (1978 rev.), there is an automatic review by the Georgia Supreme Court of sentences of death that have been imposed once the judgment has become final in the trial court. The court bases its review of death sentences upon the entire record and transcript of the trial court as well as a notice prepared by the clerk of the trial court and a report prepared by the trial judge. The sentence review process is aided by an Assistant to the Supreme Court, who is an attorney appointed pursuant to § 27–2537(f), which requires that the court

> shall accumulate the records of all capital felony cases in which sentence was imposed after January 1, 1970, or such earlier date as the court may deem appropriate. The Assistant shall provide the court with whatever extracted information it desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

Among the determinations which the Georgia Supreme Court is required to make under § 27–2537(c) in relation to death sentences is the following:

> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Mr. Dennis York, the appointed Assistant to the Supreme Court until April 30, 1979, testified at deposition that in his role as Assistant he collected, read, and summarized the transcripts of only those capital cases which had been appealed to the Supreme Court. His testimony indicates that in making its proportionality review under § 27–2537(c)(3), the Georgia Supreme Court

considered as "similar cases" only cases that had been automatically appealed as a result of death sentencing and those capital cases involving life sentences which were actually appealed. This would exclude from the pool of cases for comparison all capital cases involving life sentences which were not appealed.

What the Georgia legislature meant when it required accumulating the records of "all capital felony cases in which sentence was imposed . . ." is certainly open to interpretation.

In *Gregg v. Georgia, supra,* the judgment of the Court as announced by Justices Stewart, Powell and Stevens included a finding directed to the precise point raised by Petitioner, as follows:

> The petitioner claims that this procedure has resulted in an inadequate basis for measuring the proportionality of sentences. First, he notes that nonappealed capital convictions where a life sentence is imposed and cases involving homicides where a capital conviction is not obtained are not included in the group of cases which the Supreme Court of Georgia uses for comparative purposes. The Georgia court has the authority to consider such cases, [citation], and it does consider appealed murder cases where a life sentence has been imposed. We do not think that the petitioner's argument establishes that the Georgia court's review process is ineffective.

428 U.S. at 204 n.56, 96 S.Ct. at 2939.

The judgment was joined in by Justice Blackmun, who filed no separate opinion. Concurring opinions were filed by the Chief Justice, Justice White and Justice Rehnquist; the concurring opinions did not address the referenced issue.[17]

Whether or not *Gregg* decided the question at hand, the Court finds that Petitioner cannot complain of the alleged irregularity, because there were no other cases similar to Petitioner's at the time of his sentencing. In *Gregg, supra,* at 201, the Court noted

---

17. Justices Marshall and Brennan dissented.

that this Petitioner's case was the only one in which the death sentence had been upheld where the only statutory aggravating circumstance found was that described in Ga.Code Ann. § 27–2534.1(b)(7).[18] Petitioner has failed to indicate that there were nonappealed life sentence cases involving torture-murder that could have been compared to the present case by the Georgia Supreme Court.

Petitioner has presented or attempted to present statistical evidence by which he attempts to show that the Georgia Supreme Court's review process is inadequate. The Court finds that Petitioner's statistical analysis on this point is insufficient. He has analyzed the review process by isolating only two factors for comparison, whether the offense was accompanied by a felony and whether the offender had a prior record of criminal violence. The use of only two factors for comparison out of the many possible characteristics looked at by the Georgia Supreme Court does not provide for an accurate and complete analysis. Petitioner also argues that the review process was unfair because he was denied access to the case summaries used by the Georgia Supreme Court and because he was unable to obtain transcripts of all nonappealed capital cases due to his indigency. This Court finds that the cases cited by Petitioner[19] are inapplicable to the review process at issue and that these claims lack merit. The Court also finds that there is a lack of merit in any claim by Petitioner that the public statements concerning capital punishment attributable to the Chief Justice of the Georgia Supreme Court indicate that the review process was unfair or inadequate. Petitioner has failed to show that the Chief Justice's general views about the death penalty reflect personal bias in Petitioner's case or an improper method of sentence review generally.

### E. Petitioner's Mental Competence

█ Petitioner alleges that he is presently mentally incompetent to be executed under Georgia law and that a violation of due process and equal protection will result if his death sentence is carried out without a prior examination and hearing on his sanity. Sections 27–2601 to –2603 (1978 rev.) of the Georgia Code are at issue. Ga.Code Ann. § 27–2601 states "No person who has been convicted of a capital offense shall be entitled to any inquisition or trial to determine his sanity." Ga.Code Ann. § 27–2602 reads as follows:

**18.** In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Court held that Ga.Code Ann. § 27–2534.1(b)(7) (held constitutional on its face in *Gregg, supra*) was unconstitutionally applied based on the specific facts in *Godfrey*. Section (b)(7) allows a convicted murderer to be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The defendant in *Godfrey* killed his wife and mother-in-law by shooting each one in the head with a shotgun. No violent acts were committed against either victim aside from the actual shootings. In sentencing defendant to death for each murder, the jury found "that the offense of murder was outrageously or wantonly vile, horrible and inhuman." The jury did not specifically find that the murders involved "torture, depravity of mind, or an aggravated battery." The Georgia Supreme Court affirmed the conviction and vacated the sentence in *Godfrey v. State*, 246 Ga. 359, 274 S.E.2d 339 (1980).

In *Godfrey*, the United States Supreme Court found that the jury's finding indicated that there was no restraint on the arbitrary and capricious infliction of the death sentence prohibited by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Court was primarily concerned with the fact that the Georgia Supreme Court had previously affirmed sentences under § (b)(7) only when there was torture or aggravated battery involved in the form of serious physical abuse of the victim before death. In *Godfrey*, the defendant did not inflict any physical injury on the victims preceding their deaths.

The facts of the present case are very different from those in *Godfrey*, and indeed were so noted in the *Godfrey* decision itself. 446 U.S. at 429–430, 100 S.Ct. at 1765.

**19.** Petitioner relies primarily on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (nondisclosure of presentence materials by trial court); *Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (failure to provide free transcript of preliminary hearing to indigent); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (failure to provide free trial transcript to indigent seeking direct appeal).

Upon satisfactory evidence being offered to the Governor, showing reasonable grounds to believe that a person convicted of a capital offense has become insane subsequent to his conviction, the Governor *may*, in his discretion, have said person examined by such expert physicians as the Governor may choose, the cost of said examination to be paid by the Governor out of the contingent fund. It shall be the responsibility of the Governor to cause said physicians to receive written instructions which plainly set forth the legal definitions of insanity as recognized by the laws of this State, and said physician shall, after making the necessary examination of the prisoner, report in writing to the Governor whether or not reasonable grounds exist to raise an issue that the prisoner is insane by the standards previously specified to them by the Governor. The Governor *may*, if he shall determine that the person convicted has become insane, have the power of committing him to the Milledgeville State Hospital until his sanity shall have been restored or determined by laws now in force. (emphasis added)

Ga.Code Ann. § 27–2603 states:

When any person shall, after conviction of a capital crime, become insane, and shall be so declared in accordance with the provisions of the preceding section, the convict *shall* be received into the Milledgeville State Hospital, there to be safely kept and treated as other adjudged insane persons. All the provisions of the law relating to insane persons under sentence of imprisonment in the penitentiary shall apply to the class of cases herein provided for, so far as applicable. (emphasis added)

Petitioner first argues that Georgia's failure to provide for a hearing on his post-conviction sanity violates due process. This question was addressed by the Supreme Court in *Solesbee v. Balkcom*, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950), which held that the procedure embodied in Ga.Code Ann. § 27–2602 is not a denial of due process. Petitioner contends that the law concerning executive action and due process

has changed substantially since *Solesbee* was decided and therefore a different result is required. This Court disagrees and finds that the analysis in the majority opinion in *Solesbee* is still persuasive.

The Court does recognize a potential problem arising from apparently contradictory language in §§ 27–2602 and 27–2603. Section 27–2602 states that the Governor "may" have the power to commit an offender he has found to be insane, which indicates discretion on the part of the Governor, whereas § 27–2603 states that a convicted offender "shall" be received into the state hospital if he or she is declared insane under § 27–2602, which suggests that commitment is mandatory rather than discretionary. No problem has arisen in this case from such a statutory inconsistency, however.

Petitioner also argues that the refusal by the state to grant him funds for a psychiatric examination violates his equal protection rights because he is being denied an opportunity for relief from his death sentence solely on the basis of his indigency. However, the Court finds that Petitioner's reliance on *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and its progeny in this situation is misplaced. Petitioner has not been denied a valuable resource at trial or on appeal, nor has he been denied the basic tools of an adequate defense to the imposition of his death sentence as he alleges.

### F. Electrocution as Cruel and Unusual Punishment

Petitioner alleges that the method of execution in Georgia for carrying out a death sentence is electrocution and that such a form of execution inflicts unnecessary torture and torment, thereby constituting cruel and unusual punishment in violation of the eighth and fourteenth amendments. He contends that in comparison with other available methods of causing death, such as modern pharmacological techniques, electrocution is not a humane and civilized way to extinguish life. The

same argument was found to be without merit in *Spinkellink v. Wainwright, supra,* at 616, in which opinion the Fifth Circuit relied on *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).

Since Petitioner's argument runs squarely afoul of the law of this Circuit, this Court must reject it.

## CONCLUSION

Having examined each of Petitioner's contentions, the Court finds itself in agreement with the Magistrate's Recommendations for the reasons stated in this Order. Accordingly, the Court hereby DENIES the Petition for a Writ of Habeas Corpus.